# Illinois Official Reports

## Appellate Court

---

## *In re K.M.*, 2018 IL App (1st) 172349

---

| | |
|---|---|
| Appellate Court Caption | *In re* K.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. K.M., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-2349 |
| Filed | June 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-JD-1344; the Hon. Kristal Royce Rivers, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Todd T. McHenry, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Burke concurred in the judgment and opinion.<br>Justice Gordon concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1      After a bench trial in juvenile court, 16-year-old minor-respondent, K.M., was found guilty of aggravated unlawful use of a weapon (AUUW) and unlawful possession of a firearm (UPF). Respondent was adjudicated delinquent and sentenced to two years of probation. As conditions of his probation, the juvenile court ordered respondent, among other things, to have "no contact with gangs, guns, or drugs," to clear his social media of "anything that looks like gangs, guns, or drugs," and to disable the feature allowing others to "tag" him in a social-media post.

¶ 2      Respondent contends that the no-gang-contact and social-media probation conditions are overly broad and vague and thus violate, respectively, his fifth-amendment liberty interests and first-amendment right of free expression. These alleged errors are unpreserved, but respondent contends that they are reviewable as second-prong plain error. For the reasons that follow, we vacate the no-gang-contact condition but affirm the social-media condition. We remand to the juvenile court for entry of a revised probation order.

## I. BACKGROUND

¶ 3

¶ 4      The State charged respondent with various counts of AUUW and UPF, alleging that he was seen tossing a loaded Glock handgun into a gangway while fleeing from the police. Initially, respondent was held in the Juvenile Temporary Detention Center (JTDC), but the juvenile court released him on electronic monitoring three weeks after his arraignment. The judge ordered him not to leave his house without permission from his mother and the probation officer overseeing his electronic monitoring. A week later, the State moved to revoke his electronic monitoring. According to the probation officer's report, respondent had left his house without permission at least 16 times, often in the middle of the night, and was tracked (via his ankle bracelet) to a boarded-up house, a vacant lot, and other locations. Respondent denied that he ever left his house, but based on the probation officer's report, the judge found it "obvious[ ]" that he was "lying to her" and ordered him to return to custody at the JTDC.

¶ 5      Chicago police officer Ayala testified for the State at respondent's trial. At 9:50 p.m. on July 11, 2017, he responded to a call for backup near 79th and South Loomis Streets. He was accompanied by two other officers. As they pulled up to the scene, Officer Ayala saw three people run inside through the front door. Unsure of what was happening, Officer Ayala ran around to the back of the house, while his two partners went to the front to assist the sergeant who had called for backup. Officer Ayala saw respondent and two others jump out of a window and into the gangway. Respondent was holding a black object in his right hand. Officer Ayala heard a "clank" when respondent threw that object and it hit a fence. Respondent started running toward Officer Ayala, who was standing in a nearby alley, but stopped and ran in the opposite direction (toward 79th Street) when he saw the officer.

¶ 6      Officer Ayala walked over to the area in the gangway where respondent had tossed the object. He recovered a black .40-caliber Glock 22 firearm, loaded with 15 live rounds. The only other object on the ground near the gun was a flower pot, and there was nothing else, anywhere in the gangway, that looked like the object respondent had tossed.

¶ 7        A short time later, Officer Ayala identified respondent at the station as the person he had seen with the gun.

¶ 8        Respondent called Officer Whiting, who had arrived on the scene with Officer Ayala. Officer Whiting testified that he chased respondent after seeing him hop a fence and run toward 79th Street. But from his vantage point in front of the house, he could not see respondent toss the firearm in the gangway.

¶ 9        The juvenile court found the officers credible and attributed any potential inconsistencies in their testimony to their different vantage points. The juvenile court entered findings of guilt on one count each of AUUW and UPF.

¶ 10       Before sentencing, the juvenile probation department prepared a social investigation report. Among other things, the report stated that respondent lived with his mother, stepfather, and siblings in the Roseland community, on the far south side of Chicago, an area "known to be a high crime, gang, and drug related neighborhood." Before moving to Roseland, respondent lived in the Auburn-Gresham community, near 79th and South Laflin Streets—where he was arrested for this offense. He was arrested at or near that same intersection five times before (for criminal trespass, reckless conduct, and possession of replica firearms), but this was the first arrest that resulted in an adjudication of delinquency.

¶ 11       The Chicago Police Department claimed that respondent provides "street security" for the G-ville faction of the Gangster Disciples, based in Auburn-Gresham. Respondent denied any affiliation with the Gangster Disciples. Instead, as he admitted, he is a member of the Every Body Killer gang, which is also based in Auburn-Gresham. Respondent told the probation officer that he spends his free time in Auburn-Gresham because he does not know anybody in Roseland. He also said that he spends time near 63rd Street and King Drive, but he did not say whom he knows or what he does there. Respondent liked to smoke marijuana in his free time, but he denied any other drug or alcohol use. His mother described him as "not the most honest person" and said that he frequently violates his curfew, sometimes sneaking out of the house to spend the night in his old neighborhood in Auburn-Gresham without her permission.

¶ 12       Respondent was diagnosed with a learning disability. After falling behind academically at his neighborhood high school, he had recently transferred to an alternative school, where he was enrolled in special education classes. Respondent's mother attributed his academic difficulties to the time he spent hanging out with "negatively influencing peers." His academic performance improved at his new school, and his attendance and disciplinary records were positive. Although he had fallen behind in his academic credits, he said that he hoped to get back on track and graduate. For this reason, he expressed no interest in getting a job. In recent years, respondent's former interest in playing organized sports (basketball, in particular) had waned, and he was "uncertain" whether he wished to resume these activities.

¶ 13       Respondent maintained his innocence. He said that he went to a house party in his old neighborhood, went into the backyard, and heard someone scream that the police were coming down the alley. Everyone ran, including respondent, and he was the one who just happened to be caught. And since he was the one in custody, the police attributed the gun they found to him. But it was not his, and he did not know whose it was or where it came from.

¶ 14       After reviewing respondent's social history, the juvenile court sentenced him to 2 years on probation, subject to various conditions, including mandatory school, 20 hours of community service, a substance-abuse assessment, and participation in the SYNC mentoring

program. The court also ordered respondent to stay away from the area of 79th and South Laflin Streets, unless he was accompanied by an adult.

¶ 15 In a written sentencing order, entered on a standard, preprinted form, the judge checked the box for "no gang contact *or* activity," and wrote in "clear social media" in the space provided for "other" probation conditions. A written probation order stated, "No contact with gangs, guns, drugs including social media."

¶ 16 At the dispositional hearing, the judge further instructed respondent as follows:

"No contact with gangs, guns, or drugs. Take a look at your social media when you go home. Make sure you remove anything on there that looks like gangs, guns, or drugs. So if you've got something on there that's just you pointing your finger, that's enough for me not to like it, and that's enough for you to violate your probation. If it's a friend, and you're on there on some social media—who's posted a picture of you or who's holding a gun or has something that looks like drugs, make sure they remove it.

You are under the age of 18. That includes smoking cigarettes or anything that you could have in your mouth that looks like a drug. Make sure you take off the ability to be tagged."

¶ 17 Respondent acknowledged that he understood how to disable the "tag" function on his social media, and the court reiterated that "from this day forward," respondent was "responsible" for "anything that shows up in [his] social media." Respondent did not have any questions about these conditions when the judge asked, and his attorney did not object to any of them. This appeal followed.

¶ 18                                  II. ANALYSIS
¶ 19                  A. In-Person No-Gang-Contact Condition

¶ 20 Respondent is an admitted gang member. For this reason, he does not dispute that the juvenile court could, as a general matter, impose "valid restrictions" on his contact with (other) gang members. We agree that the juvenile court has broad discretion to restrict a minor's gang contact or activity. Such restrictions are often a critical tool for "protecting a juvenile *** from the downward spiral of criminal activity into which peer pressure may lead the child." See *Schall v. Martin*, 467 U.S. 253, 266 (1984). But we reject any implication that this discretion can be exercised reasonably *only* when the minor freely admits, or the evidence otherwise proves, that he is already gang-affiliated. See *In re Jawan S.*, 2018 IL App (1st) 172955, ¶¶ 17-20 (illegal-gang-activity restriction not an abuse of discretion even though minor denied gang membership).

¶ 21 In any event, because respondent does admit his gang affiliation, he does not contend that the juvenile court acted arbitrarily. Thus, the court did not abuse its sentencing discretion when it ordered that respondent is to have "[n]o contact with gangs" during his term of probation. But respondent claims that this restriction—while in general valid—went too far. It was overly broad, he says, where due process required it to be narrowly tailored. As a result, it may not be arbitrary, but it unduly burdens his fifth-amendment liberty interests.

¶ 22 A juvenile's liberty interests are protected by due process. *Schall*, 467 U.S. at 263-65. A probation condition that burdens the exercise of fundamental constitutional rights (as almost all of them do) must reasonably relate to the compelling state interest in reformation and

rehabilitation. *In re J.W.*, 204 Ill. 2d 50, 78 (2003). To be reasonable in this (constitutional) sense, the condition must, among other things, "narrowly focus on its rehabilitative goal." *In re R.H.*, 2017 IL App (1st) 171332, ¶ 22. A condition is "overly broad," and thus not "narrowly drawn" (internal quotation marks omitted), if it burdens the probationer's exercise of his constitutional rights substantially more than is necessary to achieve that goal. *J.W.*, 204 Ill. 2d at 78; *R.H.*, 2017 IL App (1st) 171332, ¶¶ 22-24. The constitutionality of a probation condition presents a question of law that we review *de novo*. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 56.

¶ 23    Respondent claims that the in-person no-gang-contact condition is unconstitutionally broad for the reasons we gave in *Omar F.*, where the minor was ordered to " 'stay away' from" and have " 'no contact' " with gangs. *Id.* ¶ 63. We did not invalidate gang restrictions in general in *Omar F.*, but we did find that the condition imposed in that case—the same condition imposed on respondent here—was too broad and general and thus unreasonably burdened his constitutionally protected liberty interests. *Id.* We based that holding on two highly overlapping reasons.

¶ 24    First, the blanket no-contact restriction did not differentiate between lawful and unlawful contact with gang members. As a result, it appeared to prohibit even "innocuous" or incidental contact that the minor would be hard-pressed to avoid in a gang-infested neighborhood. *Id.* ¶¶ 63, 68. Second, it failed to make exceptions allowing the minor to have contact with family members, classmates, coworkers, or others who might happen to be gang members, but whom the minor would unavoidably encounter in the course of his legitimate daily activities. *Id.* ¶ 63. In particular, it prevented the minor from having any contact with his own brother, a former gang member who had turned his life around and now served as a role model for the minor. *Id.*

¶ 25    We agree with *Omar F.* that an unqualified no-gang-contact restriction is overly broad. Suppose, for example, that respondent rides a bus to school. (A quick look at a map reveals that his new school is not particularly close to his home.) Respondent wants to steer clear of gang members, as best he can, to comply with the terms of his probation. Respondent is now caught in a dilemma. He wants to go to school—indeed, the juvenile court has *ordered* him to go to school as a condition of probation. But he lives in an area where gang membership is prevalent. He is almost certain to encounter gang members on his way to school.

¶ 26    Snubbing the gang member could be risky; it might be perceived as a slight and trigger a confrontation. But, taking the order at face value, he could violate his probation simply by exchanging greetings—if only for the innocent purpose of mollifying the gang member—and continuing on his way. He has, after all, made "contact" with a gang member, as any competent, reasonable speaker of the English language would understand that term. In this way, a blanket no-gang-contact condition prohibits the kinds of innocent, incidental contact with gang members that respondent, living in a gang-infested neighborhood, is likely (if not certain) to have during the course of his ordinary daily activities.

¶ 27    And the problem is not just with passing contact on the street or the bus, which would be hard enough for respondent to avoid. The order reaches every facet of his life and daily activities. If any of his siblings join a gang, respondent will, strictly speaking, violate his probation just by joining them for dinner or sharing a bedroom with them, thus having "contact" with gang members. If there are gang members at respondent's high school, he will violate his probation just by working on an assigned math problem with one of them during

class. The same problem will arise if respondent takes a job, joins an athletic league for at-risk youth, or does virtually anything else. Without further qualification, the order is sweeping in its scope.

¶ 28      We will not indulge the fantasy that respondent, despite living in a neighborhood unfortunately blighted by gangs, drugs, and violent crime, may somehow manage to cut a path through life that simply avoids contact with any gang members. An order that requires him to do so is, for all practical purposes, impossible for him to obey.

¶ 29      It is no objection that respondent, unlike Omar F., has not named a specific gang member that he needs or wants to contact for some legitimate purpose. See *id.* (minor's brother specifically identified as within scope of overly broad order). The probation order, as written, leaves respondent perpetually walking on eggshells. At any moment, he could end up violating his probation, even unknowingly, just by doing what he is *supposed* to be doing—attending school, performing community service, staying home at night instead of taking to the streets. See *id.* ¶ 68. That is why the unqualified no-gang-contact condition needed to be narrowed in *Omar F.*, and why it needs to be narrowed again here: to allow these minors to go about their lives; to engage in positive, productive activities; and to interact in innocuous ways with the people they will inevitably encounter while doing so. A probation order that leaves them perpetually afraid to live their lives is an unreasonable and unnecessary restriction of their liberty, and one that will tend to thwart, rather than promote, their rehabilitation.

¶ 30      Pressed to defend this sweeping order at oral argument, the State maintained that what we have called innocent or incidental contact is not within its scope because none of it counts as "contact" in the first place. On the State's view, "contact" requires an effort to forge an abiding association with another—in this case, a gang and the gang's criminal activities and purposes.

¶ 31      The State is wrong. Any competent speaker of English would say that two people who have had a conversation—at the bus stop, on the school lunch line, or anywhere else—have had contact with each other. Not *much* contact, based just on this, but contact all the same. If the order prohibited gang *activity*, the State's argument would have some merit; the examples we have discussed all feature contact with gang members, but not gang activity, criminal or otherwise. See *Jawan S.*, 2018 IL App (1st) 172955, ¶¶ 27-35 (distinguishing no-illegal-gang-activity condition from no-gang-contact condition). But the written probation order prohibits "gang contact *or* activity" and, thus, applies more broadly than a narrow prohibition on overt participation in gang-related enterprises. And the judge, addressing respondent in court, did not mention gang *activity* at all; she said that her order required "[n]o contact with gangs," period.

¶ 32      Thus, the probation order does not mean what the State says it means. We appreciate the State's apparent recognition that it would be unreasonable to impose a condition as broad and pervasive as we understand this order to be. But that is what the order says. It is not the State's prerogative to rewrite it on appeal. Or ours.

¶ 33      Not to worry, the State continues: Respondent, in any event, would not be violated for "engaging in innocent conduct," and neither the probation officer nor the juvenile court would otherwise "arbitrarily enforce[ ]" the probation order. We certainly agree that most probation officers and juvenile-court judges act reasonably most of the time. But there are no guarantees.

¶ 34    Consider, for example, *Arciniega v. Freeman*, 404 U.S. 4 (1971) (*per curiam*). As a condition of his parole, Arciniega was forbidden to "associate" with other ex-convicts. *Id.* at 4. During his parole, he took a job at a restaurant where other ex-convicts were employed. *Id.* There was no other "evidence" of the prohibited "association." *Id.*

¶ 35    One might think—similar to the State's argument here—that nobody would be found in violation of that probation condition in *Arciniega* merely for working at a legitimate job alongside other ex-convicts, that "associating" with ex-convicts in this regard would not be prohibited association. Yet, that is exactly what happened; the parole board revoked Arciniega's parole on this basis alone, for working alongside ex-cons at a legitimate job. *Id.* After the lower federal courts denied Arciniega's *habeas corpus* petition, the Supreme Court summarily reversed. The Court held that the condition restricting *association* could not have been intended to apply to Arciniega's "on-the-job *contact*," that is, his "incidental *contacts* [with other ex-convicts] in the course of work on a legitimate job for a common employer." (Emphases added.) *Id.* at 4-5; see also *United States v. Soltero*, 510 F.3d 858, 866-67 (9th Cir. 2007) (condition forbidding "association" with gang members required more than "incidental contacts" with them). Including these mere "contacts" within the scope of his parole condition would leave him "vulnerable to imprisonment" for circumstances beyond his control, which arose in the course of his legitimate activities. See *Arciniega*, 404 U.S. at 4. And that would surely be unreasonable.

¶ 36    Respondent's situation is more perilous still. The condition that governs his conduct says, in no uncertain terms, that *contact* alone—on the job, in school, or anywhere else—is enough to put him in jeopardy. If, like Arciniega, respondent were to be violated, for circumstances similarly beyond his control, we would not be able to say that his "incidental contacts" did not amount to "association." The word "contact" is far broader than "association." Respondent's probation order must be narrowed.

¶ 37    In a similar vein, the State, at oral argument, argued that respondent could simply go back to his probation officer for advance approval of certain innocuous "contacts" in which he expects to engage in his daily life. We would certainly encourage respondents in such a situation to do so. Maybe had respondent done so here, his probation officer would have put him at ease on this question. But maybe not. We cannot assume so, as the example in *Arciniega*, 404 U.S. at 4, makes clear. Nor can we assume that a 17-year-old special education student would have the wherewithal to fully protect his rights in this regard. After all, his trial attorney apparently saw no problem with the court's probation condition, which is why the issue was forfeited, requiring plain-error review on appeal. And juveniles on probation are not typically accompanied by counsel when they meet with their probation officers. In any event, it is putting a lot on a juvenile to expect him to compile a comprehensive list of all possible scenarios in which he might unintentionally violate the probation condition, present them to the probation officer, and receive a satisfactory resolution of the problem in advance.

¶ 38    To be clear: We are *not* suggesting that respondent would suffer the same fate as Arciniega. We mean no disrespect to the juvenile court, which obviously was concerned with respondent's welfare and rehabilitation. And we would hope and expect that the assigned probation officer would act reasonably, as well, in overseeing respondent's probation. But that is not the point. An unconstitutionally broad provision cannot be upheld based on the prosecution's assurances that it will be applied with circumspection, so that the constitutional

violations it authorizes will never, as a practical matter, come to pass. *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). The constitution, as Chief Justice Roberts explained in *Stevens*, requires more than this bare promise of "*noblesse oblige*" by government officials. *Id.* When a provision carrying the force of law, be it a statute or a court order, grants officials unconstitutionally broad discretion to deprive citizens of their liberty, that provision must be scratched and rewritten. See *id.* The constitution demands that remedy here.

¶ 39     It is not our place to dictate to the juvenile court how to remedy this overbreadth. We cannot pretend to provide comprehensive guidance on the myriad questions that will arise in assessing the various gang-related conditions that the juvenile court might impose in this, or any other, case. Nor do we wish to intrude on the juvenile court's discretion to tailor gang-related conditions to individual cases or to suggest that there is a one-size-fits-all solution. As we have recently emphasized, some cases may call for more restrictive gang-related conditions, while others may call for less, and the juvenile court is in the best position to make this determination in the first instance. *Jawan S.*, 2018 IL App (1st) 172955, ¶ 36. But the remedy must involve some narrowing of this probation condition to reflect innocuous, incidental "contact" or to provide exceptions for educational, familial, and employment settings. See, *e.g.*, Admin. Office of the United States Courts Prob. & Pretrial Servs. Office, Overview of Probation and Supervised Release Conditions 58 (2016), http://www.uscourts.gov/sites/default/files/overview_of_probation_and_supervised_release _conditions_0.pdf ("Direct contact [with certain persons] does not include incidental contact during ordinary daily activities in public places."). Without such tailoring, the order sweeps too broadly under the governing constitutional standards.

¶ 40     Having found the no-gang-contact condition overly broad and unconstitutional, we now consider respondent's argument that it amounts to second-prong plain error. Respondent must show that the unconstitutional condition was a clear error and serious enough to deny him a fair dispositional hearing. *Omar F.*, 2017 IL App (1st) 171073, ¶ 66; see *People v. Fort*, 2017 IL 118966, ¶ 18.

¶ 41     We agree with *Omar F.*'s conclusion that this error is reviewable as second-prong plain error. To begin, we note that this category is broader than the limited class of errors deemed "structural" under federal law. *People v. Clark*, 2016 IL 118845, ¶ 46. And our supreme court has long held that "[t]he imposition of an unauthorized sentence" may be reviewed for second-prong plain error because it "affects substantial rights." (Internal quotation marks omitted.) *Fort*, 2017 IL 118966, ¶ 19 (citing cases). We acknowledge that before *Omar F.*, we applied this principle when the trial court imposed a sentence that violated *a statute*. See, *e.g.*, *People v. Cox*, 2017 IL App (1st) 151536, ¶¶ 99-102 (imposition of $5 electronic citation fine was second-prong plain error where not authorized by statute). But we cannot imagine that a sentencing error is less "serious" or less worthy of our review because it violates *the constitution*, as the error in this case does.

¶ 42     Our supreme court has also explained that, despite some superficial linguistic differences, our second-prong plain-error rule "involves the same considerations" as the federal plain-error rule. *People v. Herron*, 215 Ill. 2d 167, 186 (2005). We thus find it persuasive, in this context, that federal courts review what they call "uncontested conditions," that is, unpreserved claims of error in probation or supervised-release conditions, for plain error.

See, *e.g.*, *United States v. Kappes*, 782 F.3d 828, 844 (7th Cir. 2015); *United States v. Ross*, 475 F.3d 871, 873 (7th Cir. 2007) (condition is plain error if it is "of such significance that a failure to correct it may result in a miscarriage of justice").

¶ 43 The error in the no-gang-contact condition is both clear and serious enough to warrant reversal under the plain-error rule. As we have explained, this condition, left as it is, will leave respondent perpetually walking on eggshells, fearful that at any moment, he might violate his probation, even unknowingly, and even due to circumstances beyond his control. Taking the no-contact order in its ordinary English sense, respondent will be fearful of the daily, productive endeavors that are essential to his rehabilitation, including the activities—like travelling to and attending school—that the juvenile court required of him as further conditions of his probation.

¶ 44 This error is serious indeed. It pervasively intrudes on respondent's liberty interests and imposes needless, and surely unintended, obstacles to his rehabilitation. We do not believe the plain-error rule requires us to elevate his attorney's forfeiture of an obvious constitutional error over due-process principles and respondent's own welfare, the paramount concern of the Juvenile Court Act of 1987. *In re D.S.*, 198 Ill. 2d 309, 328 (2001); see 705 ILCS 405/1-1 *et seq.* (West 1998). And the State has given us no reason to conclude otherwise. Indeed, the State's only argument is that the condition is not error at all; it never argues that any error we might find could not be remedied under the second prong of the plain-error rule.

¶ 45 Respondent has carried his burden of demonstrating plain error. We vacate the in-person, no-gang-contact condition and remand to the juvenile court for a revised probation order.

¶ 46 Although we have vacated the probation condition at issue, respondent raises one further argument that we think it is appropriate and prudent to address. Respondent contends that the term "gang" is "notoriously imprecise" and not readily susceptible to clear definition. Thus, he says, to save a gang prohibition (of whatever sort) from being unconstitutionally vague, the juvenile court must list the specific gangs that are included within its scope. We address this argument to provide guidance to the juvenile court on remand.

¶ 47 A probation order must clearly notify the probationer of what conduct is required of him and what conduct is prohibited. *Jawan S.*, 2018 IL App (1st) 172955, ¶ 39; *People v. Taube*, 299 Ill. App. 3d 715, 723 (1998). Thus, its terms must be clear enough that "a person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly" (internal quotation marks omitted) (*Jawan S.*, 2018 IL App (1st) 172955, ¶ 39), without having to "guess at its meaning" (internal quotation marks omitted) (*Fagiano v. Police Board of the City of Chicago*, 98 Ill. 2d 277, 282 (1983)).

¶ 48 We agree that a precise, general definition of the term "gang" is elusive. And any attempt to provide one would likely only muddy the waters. But does this mean respondent is left to "guess" at what a gang is? Will he not know what the juvenile court is referring to? We think he would know. He had no difficulty recognizing and admitting that he is in one gang (the Every Body Killers). He had no difficulty denying that he is in another (the Gangster Disciples). And he did not need a definition of the term "gang" to know that these were gangs. We have no reason to think he will have any more difficulty recognizing any other gang he may encounter for what it is. See *R.H.*, 2017 IL App (1st) 171332, ¶ 34 ("The trial judge, the probation officer, and, surely, R.H. know what 'gangs' mean, and to suggest otherwise *** is sophistry.").

¶ 49    We will not require the juvenile court to provide, in place of a "definition," a specific list of gangs that respondent is required to avoid. As we said in *R.H.*, that requirement is unwieldy, requiring the juvenile court to maintain an up-to-date, working knowledge of the gangs any given juvenile might encounter in any particular locale within Cook County. *Id.* ¶ 32. And the list may easily become stale, as gang identities and allegiances shift, or as juveniles move from one area to another. *Id.* ¶ 33.

¶ 50    Respondent's circumstances ensure that these problems will arise in spades if we require the juvenile court to list specific gangs in the probation order. At the time of his disposition, respondent still identified as a member of a gang in his old neighborhood of Auburn-Gresham, where he would sometimes spend the night after sneaking out of his mother's house without permission. The juvenile court prohibited him from going to Auburn-Gresham without adult supervision. Hopefully this will put a damper on his contact with his old gang. But now he is likely to spend more time in Roseland, his new neighborhood, which is also heavily occupied by gangs. He claims he does not know anybody there, but that is likely to change soon if he can no longer go to Auburn-Gresham. Respondent also told the probation officer that he likes to spend some of his free time in yet another neighborhood, where there are likely to be different gangs operating. And his new school—an alternative school, not a neighborhood school, and so one that likely draws students from a wide geographic area—is elsewhere still.

¶ 51    There is simply no telling how many different gangs respondent may encounter in his daily travels. Requiring the juvenile court and probation officer to compile a specific yet exhaustive list is not realistic. Nor is it constitutionally required. Due process permits a conduct prohibition to be crafted with "flexibility and reasonable breadth, rather than meticulous specificity," as long as it makes reasonably clear, to those it governs, what conduct it prohibits. (Internal quotation marks omitted.) *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); see also *Soltero*, 510 F.3d at 866 (term "criminal street gang," as used in supervised-release condition, was not unconstitutionally vague, even without enumeration of specific gangs). That standard is satisfied here.

¶ 52                              B. Social-Media Restriction

¶ 53    Respondent also challenges the social-media restriction included in his probation conditions. His challenge to this condition mirrors his challenge to the in-person gang-contact restriction. That is, respondent acknowledges that the juvenile court could, in general, impose valid restrictions on his use of social media and that the restriction could, at least to some extent, limit his gang-related posts.

¶ 54    We certainly agree. Because social media is now a ubiquitous method of communication and interaction among adolescents like respondent, restrictions on its use are indispensable to the goal of rehabilitation. Indeed, "[i]f the juvenile court has any hope of steering [an adolescent] toward a new direction and productive life, it would be absurd to target only real-world behavior and ignore online activity." *R.H.*, 2017 IL App (1st) 171332, ¶ 26. This is of course true for any juvenile probationer, but it is especially important in a case like this, where the need to steer the juvenile far away from his gang has already become an urgent task for the juvenile court.

¶ 55    Respondent contends, however, that the social-media restriction imposed went too far. It is a content-based restriction, he says, that is too broad to survive strict scrutiny and therefore

violates his first-amendment right to freedom of expression. Respondent also complains that it is unconstitutionally vague.

¶ 56 In the written sentencing order, the juvenile court simply ordered respondent to "clear [his] social media." His written probation order states, "No contact with gangs, guns, drugs including social media." The judge elaborated on what these orders were intended to require at the dispositional hearing:

"Take a look at your social media when you go home. Make sure you remove anything on there that looks like gangs, guns, or drugs. So if you've got something on there that's just you pointing your finger, that's enough for me not to like it, and that's enough for you to violate your probation. If it's a friend, and you're on there on some social media—who's posted a picture of you or who's holding a gun or has something that looks like drugs, make sure they remove it.

You are under the age of 18. That includes smoking cigarettes or anything that you could have in your mouth that looks like a drug. Make sure you take off the ability to be tagged."

¶ 57 The juvenile court thus restricted respondent's social-media postings on three topics—gangs, guns, and drugs. The State does not contest that this is a content-based restriction since it regulates his speech based on "the topic discussed or the idea or message expressed." See *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015). Generally, content-based restrictions are highly disfavored, subject to strict scrutiny, and must be narrowly tailored to serve compelling state interests. *Id.* at ___, 135 S. Ct. at 2226. But the need to supervise a probationer, foster his rehabilitation, and protect the public permit a court to impose restrictions on his constitutionally protected freedoms that would not be reasonable to impose on the public at large. *United States v. Knights*, 534 U.S. 112, 119 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 873-75 (1987). The constitutional standards that apply to probationers, in other words, are not necessarily the same as those that apply to the public at large; thus, probation conditions that restrict the exercise of constitutional rights are considered "narrowly tailored" as long as they "reasonably relate" to the probationary goal of rehabilitation. *J.W.*, 204 Ill. 2d at 78; *R.H.*, 2017 IL App (1st) 171332, ¶ 22. And in reviewing a juvenile probation condition, we are mindful that minors, due to their special vulnerabilities, do not enjoy the full measure of constitutional rights that adults do. *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality opinion); *R.H.*, 2017 IL App (1st) 171332, ¶ 20.

¶ 58 Respondent offers three examples of the social-media restriction's alleged overbreadth. First, he complains that he will violate his probation whenever a "friend" on social media tags him in a "questionable post." But this should not happen. The juvenile court ordered respondent to disable the feature allowing him to be tagged by others, and respondent acknowledged that he understood how to do so. If respondent complies with this order, he will not find himself tagged in any posts, questionable or otherwise. And respondent does not claim, nor could he plausibly claim, that the order to disable the tagging feature itself violates his first-amendment rights.

¶ 59 Second, respondent complains that he will violate his probation "if he so much as points his finger in a photo on social media." The juvenile court ordered respondent not to post any photos (or videos) in which he is flashing gang signs—or making any gestures that arguably "look[ ] like" gang signs. For reasons like those we have already discussed, we do not think it is practical to require the juvenile court to maintain an up-to-the-minute knowledge of what

hand gestures (or other symbols) are associated with all the various gangs respondent may encounter in his daily life. See *R.H.*, 2017 IL App (1st) 171332, ¶¶ 33-34. So we think it was reasonable for the judge to impose a broad prohibition in this area and to require respondent to exercise the utmost caution in deciding how to depict himself on social media.

¶ 60 To be sure, respondent is well advised to keep the pictures and videos he posts to a bare minimum with plainly unobjectionable content. But we do not find this requirement to be a significant infringement on his first-amendment rights. Respondent is not an ordinary citizen; he is a teenage gang member who was arrested while fleeing from the police with a loaded handgun; who has habitually violated his curfew and electronic-monitoring restrictions; and who nonetheless was granted probation, with conditions, in lieu of serving time in juvenile detention. Curtailing his right to post depictions of himself in arguably gang-related postures is an entirely reasonable price to ask him to pay for his liberty—even if the restriction, from time to time, requires him to refrain from posting a photo that, in reality, is perfectly innocent. See *id.* ¶ 52 (Neville, P.J., dissenting) (noting that many symbols of gang affiliation are commonly displayed in entirely innocent ways).

¶ 61 And as we noted recently in *Jawan S.*, 2018 IL App (1st) 172955, ¶ 62, a juvenile probationer's continued public association with gangs or illegal activity, online or otherwise, poses a clear threat to his rehabilitation and any positive, productive ambitions he may have in life. In requiring respondent to keep his social media free of any posts that may arguably compromise his future prospects, the juvenile court clearly acted with his best interests in mind.

¶ 62 Third, respondent says that he is also prohibited from making any "anti-gun, anti-drug, or anti-gang" posts on his social media. As we understand the judge's explanation of the condition, these posts would only be prohibited if they involve depictions of ("anything *** that looks like") gangs, guns, or drugs. But even if the order could be interpreted to mean anything posted on social media—including nothing but the written word, without any images—we would still find the order constitutional. As we have emphasized, respondent is not an ordinary citizen. He is a delinquent minor, and given the juvenile court's concerns with his rehabilitative needs, it was reasonable for the court to want to keep him as far away from these topics as possible. *Id.* ¶ 65; *R.H.*, 2017 IL App (1st) 171332, ¶ 34 ("There is no positive benefit to either [the minor] or society for allowing [him] to post about gangs in any context ***.")

¶ 63 Indeed, because he is an impressionable and vulnerable teenager, it was reasonable for the juvenile court to think that respondent needed to be sheltered from these topics while he focused on getting his own life in order. From the juvenile court's perspective, his own rehabilitation takes precedence over his right to contribute to public discussion. See *Schall*, 467 U.S. at 265 ("the juvenile's liberty interest may, in appropriate circumstances, be subordinated to the State's *parens patriae* interest in preserving and promoting the welfare of the child" (internal quotation marks omitted)). And in due course, respondent's successful rehabilitation will leave him all the more able to address these topics in a positive and productive voice.

¶ 64 Thus, respondent has not identified any way in which the social-media restriction places an unreasonable burden on his first-amendment rights. This restriction is not like the overbroad statute in *Packingham v. North Carolina*, 582 U.S. ___, 137 S. Ct. 1730 (2017), which completely prohibited sex offenders from using any social networking site (defined

broadly to include commercial sites like Amazon) that is also used by minors. Respondent is not prohibited from using social media; he is prohibited from posting certain kinds of content. And the content-restrictions hew closely to the juvenile court's entirely reasonable assessment of his rehabilitative needs. The social-media restriction is not unduly broad.

¶ 65 Respondent contends that it will be all but impossible for him to use social media without running afoul of the restriction, and it thus has the same practical effect as an outright ban. We disagree. Respondent can easily refrain from posting any content that violates his probation order. He can prevent others from posting such content on his page or from tagging him in any photos or videos. If he complies with the juvenile court's admonishment to take responsibility for everything that appears on his social media, respondent will not be left in constant danger—and need not be in constant fear—of violating his probation due to circumstances beyond his control. Respondent, in short, has far more control over his social-media content than he has over his contacts in the brick-and-mortar world. In this respect, a social-media restriction does not need to be tailored quite as narrowly as an in-person contact restriction.

¶ 66 For this reason, we respectfully disagree with *Omar F.*'s conclusion that a similar social-media restriction was unconstitutional, even though we agree with its conclusion that the in-person contact restriction was overly broad. See *Omar F.*, 2017 IL App (1st) 171073, ¶ 63. In our view, *Omar F.* incorrectly grouped the two probation conditions together, without due regard for this important difference. See *id.* Rather, we agree with the narrow-tailoring analysis in *R.H.*, 2017 IL App (1st) 171332, ¶¶ 8, 24-35, which upheld a probation condition that required the minor to delete from his social media " 'all references to gangs, guns, or drugs.' " As in *R.H.*, we find that the social-media restriction imposed here only minimally curtails respondent's first-amendment rights, is reasonably related to his rehabilitative needs, and is thus well within the constitutional limits of the juvenile court's authority. And for reasons we have already explained, the absence of a general definition of the term "gang," or a list of specific gangs that fall within the order's scope, does not render the social-media prohibition unconstitutionally vague.

¶ 67 In sum, the social-media condition does not violate respondent's first-amendment rights. We affirm that probation condition in its entirety.

¶ 68                                                    C. Response to Dissent

¶ 69 The dissent seems to suggest that we should not be deciding this appeal, that our decision is "advisory," that we are "ignoring" the fact that the juvenile could have returned to the circuit court for a modification of his probation, that we are "encourag[ing] a juvenile to rush to appeal," and that we are "undercut[ting] the process set forth by our legislature and undermin[ing] the authority of the juvenile court and its officers." *Infra* ¶¶ 93, 95. We are doing nothing so remarkable or diabolical as that. We are simply doing our job—we are deciding a case over which we have jurisdiction (nobody contends otherwise) and in which no party has remotely suggested any barriers to our review such as mootness, ripeness, or lack of standing. The dissent has provided absolutely no legal basis for us *not* to adjudicate this appeal.

¶ 70 Indeed, if a juvenile's failure to object to a probation condition below, or to later seek modification in the juvenile court, makes an appellate opinion "advisory," then the same would have to be said of our supreme court's decision in *J.W.*, 204 Ill. 2d at 60-61, where the

- 13 -

supreme court invalidated a probation condition as overly broad and unconstitutional (as we are doing here) despite the fact that J.W. "did not raise th[e] issue[ ] in the trial court" and, in fact, J.W.'s parents expressly *agreed* to the condition. To say nothing of recent decisions of this court on this subject, including *In re J'Lavon T.*, 2018 IL App (1st) 180228, ¶ 5, which reviewed (and invalidated) no-gang-contact and social-media probation restrictions, despite the fact that "[t]he respondent neither objected to the probation conditions at the dispositional hearing nor filed a post-adjudication motion." Or *Omar F.*, 2017 IL App (1st) 171073, ¶ 52, where the juvenile likewise "never objected to the imposition of the probation conditions at the dispositional hearing." Not to forget *R.H.*, 2017 IL App (1st) 171332, ¶¶ 10-27, 37, where the juvenile failed to object to his probation condition below, requiring a plain-error review from this court.

¶ 71    We doubt that the supreme court, or any of the appellate panels in those other decisions, considered their opinions "advisory" or an all-out assault on the authority of the legislature or probation officers. Those courts all did the same thing we are doing: deciding a case over which we unquestionably have jurisdiction, involving serious constitutional challenges that the juvenile did not assert in the trial court.

¶ 72    That is precisely why we have the plain-error doctrine—to allow defendants to raise errors on appeal, under certain circumstances, that their trial attorneys missed. For some reason, the dissent believes that juveniles on probation, of all people, should not have that same right. Juveniles, that is, who are often represented at trial by the Cook County Public Defender (as here), which no longer represents the juvenile upon the filing of the notice of appeal—at that point, a different office, the State Appellate Defender, takes over, to advocate for the juvenile's position *on appeal*. See 725 ILCS 105/10(a) (West 2016).

¶ 73    Sure, it would be great if an unrepresented, indigent juvenile such as the one before us, a 17-year-old special education student, had the wherewithal to assert his rights by returning to the juvenile court—perhaps even asking the public defender to represent him once more—for a modification of his probation condition. But to go the next step and hold that his *failure* to do so is a death blow to his appeal would be nothing short of draconian.

¶ 74    The dissent also says that we cannot review the constitutionality of this probation condition because respondent did not challenge the underlying juvenile-probation *statute* that authorized it. We respectfully disagree for several reasons.

¶ 75    First, the dissent stands the usual principle of constitutional avoidance on its head. We are supposed to *avoid* striking down statutes as unconstitutional, except as a last resort. Instead, the dissent would have us go looking for a statute to invalidate—when respondent has not asked for any such remedy—as a precondition to hearing his (far more modest) challenge to a single probation condition imposed in a single court order.

¶ 76    A juvenile court imposed a probation condition on respondent that, in his view (and ours), unreasonably curtailed his constitutional rights. Why does the source of the court's authority—a statute, the common law, a supreme court rule—make a bit of difference as to whether the juvenile can challenge the constitutionality of that order independently? It is not as if the juvenile-probation statute puts a straitjacket on judges. It does not mandate the precise language, word-for-word, of a given probation condition. It does not mandate anything. It gives general topics appropriate for probation, with general guidelines. Juvenile courts are expected to, and often do, tailor the general language to fit the specific circumstances of a given case. How the juvenile court chooses to do so in a given case—the

order ultimately fashioned by the court in its discretion—is what restricts the juvenile's freedom. But the juvenile cannot complain of that order unless he tries to take down the general authorizing statute with it? The dissent cites no authority for that proposition.

¶ 77   That would be like saying an administrative rule promulgated by a state agency that violates the constitution cannot be challenged unless a party *also* challenges the state law that authorized the agency to promulgate that rule. That is not the law. A general authorization to do something—to promulgate an administrative rule; to impose a condition of probation—is not necessarily unconstitutional simply because the actor to which the authority was delegated (the agency or the judge) exercised that authority in an unconstitutional manner. There may be instances where the general authorization itself could be challenged, but to suggest that this would always be the case—or absolutely *must* be the case—is simply incorrect.

¶ 78   This case being a perfect example: we do not see how respondent *could* challenge subsection 2(s) directly. Respondent claims that his no-gang-contact condition is overly broad, meaning that it restricts his liberty substantially more than is necessary to achieve its (rehabilitative) purpose. See *J.W.*, 204 Ill. 2d at 78; *R.H.*, 2017 IL App (1st) 171332, ¶¶ 22-24. That standard makes sense for a challenge to a probation condition, which directly restricts the probationer's liberty. And it makes sense for a criminal statute, which also directly prohibits certain acts. See, *e.g.*, *People v. Madrigal*, 241 Ill. 2d 463, 466-68 (2011) (criminal statute may be overly broad if it criminalizes substantial amount of innocent conduct along with the guilty conduct it is meant to punish).

¶ 79   But a permissive statute concerning probation does not prohibit or mandate anything; it has no sanction for noncompliance; and a juvenile-court judge is not even required to impose it. Challenging a discretionary sentencing statute as overly broad thus makes no more sense than challenging it as vague—which one cannot do. *Beckles v. United States*, 580 U.S. ___, ___, 137 S. Ct. 886, 894-95 (2017) (federal sentencing guidelines are not subject to vagueness challenge, as they "do not regulate the public by prohibiting any conduct" but, rather, simply provide guidelines for exercise of sentencing court's discretion).

¶ 80   A permissive sentencing statute like subsection 2(d) can only affect someone if a court *chooses*, in its discretion, to issue an order consistent with it. If that happens, the probationer is perfectly free to challenge the *order* as an abuse of discretion or as an infringement on their constitutional rights. The statutory provision, which merely gave the juvenile court the option to impose the challenged condition and to tailor it appropriately for a given case, would fall out of play at that point. Thus, it is not the proper subject of a constitutional challenge at all. The challenge lies against the order, as respondent has properly recognized here.

¶ 81                                   III. CONCLUSION

¶ 82   For the foregoing reasons, we vacate the probation condition ordering respondent to have no contact with gangs, guns, or drugs; affirm the condition restricting his social-media use; and remand to the juvenile court for entry of a revised probation order.

¶ 83   Affirmed in part, vacated in part, and remanded with directions.

¶ 84    JUSTICE GORDON, concurring in part and dissenting in part:

¶ 85    There is a process, set in place by our legislature, that the majority ignores. A juvenile defendant is expected to work with his or her probation officer and the juvenile court. The appellate court was not designed to be the place of first resort if the juvenile does not understand a probation condition or finds a condition too cumbersome to work in practice.

¶ 86    For the following reasons, I concur with the majority's finding to affirm the juvenile court's condition concerning social media, but I must respectfully dissent from the finding that the juvenile court's order of no-contact-with-gangs rose to the level of second-prong plain error.

¶ 87                                 I. Overreaching

¶ 88    In the case at bar, the record does not show that the juvenile defendant ever registered a word of complaint about the probation condition until this appeal—not to the juvenile court and not to the probation officer who authored a presentence report suggesting the condition. In the presentence report, the probation officer specifically recommended "no contact with gangs, guns or drugs" pursuant to statute. The defendant and his counsel voiced no complaint to the juvenile court about this recommendation.

¶ 89    The Juvenile Court Act of 1987 (Act) contemplates that a juvenile defendant will be regularly monitored. Every six months the probation officer sends a report to the juvenile court. 705 ILCS 405/5-745(2) (West 2016).[1] In addition, anyone interested in the minor, including the minor himself, can request a change in condition. As the record in this case demonstrates, this was never done. 705 ILCS 405/5-745(3) (West 2016) ("[t]he minor or any person interested in the minor may apply to the [juvenile] court for a change").

¶ 90    For all this court knows, the juvenile defendant's probation may have already terminated satisfactorily and we may be issuing a moot opinion. The juvenile court may terminate probation satisfactorily at any time. 705 ILCS 405/5-715 (West 2016) (the juvenile court may terminate probation "at any time if warranted by the conduct of the minor and the ends of justice"). Thus, our opinion may already be moot from the passage of time.

¶ 91    Yet another reason that an appellate court should not encourage appeals like this one is that appellate jurisdiction freezes the status quo. Normally, when a notice of appeal is filed, the trial court loses its jurisdiction to act. *People v. Patrick*, 2011 IL 111666, ¶ 39 ("once a notice of appeal has been filed, the trial court loses jurisdiction"). The notice of appeal in this case was filed in September 2017, almost nine months ago. During all this time, the juvenile court has been prevented from ameliorating the situation with the stroke of a pen. Thus, we should not encourage appeals like this one because they are nonproductive.

¶ 92    Just as Dorothy in the *Wizard of Oz* always had the power to return to Kansas by clicking her heels, the juvenile defendant always had, and still has, the ability to ask his probation officer and the juvenile court for a change in condition. He did not need us or this opinion to do that. He always had that ability—and he chose not to exercise it.

---

[1]The Act requires the juvenile defendant's guardian or legal custodian, who may be his probation officer, to "file updated case plans with the court every 6 months." 705 ILCS 405/5-745(2) (West 2016); 705 ILCS 405/5-740(1)(b) (West 2016) (permitting placement "under the guardianship of a probation officer").

¶ 93    The last thing that a reviewing court, with a frozen and out-of-date record, should want to do is to encourage a juvenile to rush to appeal, bypassing the mechanisms set in place by our legislature, who decided that a juvenile's probation conditions should be considered, first and foremost, by the people with their feet on the ground—the probation officer and the juvenile court. 705 ILCS 405/5-745(2), (3) (West 2016); see also 705 ILCS 405/5-740 (West 2016).

¶ 94    If the juvenile had objected—at any time—to the court below and if the court had flat-out refused his request, then this case would be in a different posture. But that is not the case before us.

¶ 95    I cannot join in an opinion that undercuts the process set forth by our legislature and undermines the authority of the juvenile court and its officers.

¶ 96    Unfortunately, that is not the only orderly process ignored here. There is another statute here. It specifically authorizes the juvenile court to order a juvenile defendant to have no "contact" with gangs. The majority does not find either (1) that the juvenile court violated the statute[2] or (2) that the statute is unconstitutional.[3] An appellate court should not simply ignore the legal process set forth in a statute and craft its own simply because it has the power to do so—either the statute's no "contact" provision is constitutional or it is not. 705 ILCS 405/5-715(2)(s) (West 2016). How can we find that a trial court erred by applying a statute word for word unless we find that the statute is unconstitutional? And how can we find, not just that the trial court erred, but that it committed plain error by adhering to the words of a statute? And how do we find a statute unconstitutional when the defendant never made that claim or argument?

¶ 97    On appeal, respondent does not argue that the statute is unconstitutional on its face or as applied to him. He does not even cite the statute in either his initial appellate brief or his reply brief. Since respondent chose not to contest the validity of the authorizing statute, the only portion of the condition on review before us is the portion of the condition that differs from the authorizing statute. The primary difference between the language of the statute and the condition penned by the trial court is the trial court's specific inclusion of the words "social media," which I discuss later in this dissent.

¶ 98                              II. No Contact With Gangs

¶ 99    To the extent that this court chooses to consider the "no contact with gangs" provision, I cannot find plain error on the specific facts of this particular case.

¶ 100   Considering that this offense involved a loaded gun and that the juvenile is an admitted gang member, this restriction is reasonably related to the offense and to the rehabilitation of this particular offender.[4] *J.W.*, 204 Ill. 2d at 79. In the case at bar, the juvenile previously failed home detention, in part, because he was sneaking out in the middle of the night.

---

[2]The majority stresses that the probation condition violates not the statute, but the constitution. *Supra* ¶ 41.

[3]The majority concludes that "[t]he word 'contact,' " used in the statute, is too broad and "must be narrowed" (*supra* ¶ 36), but without finding the statute unconstitutional.

[4]Affirming the social media condition, the majority observes: "Respondent is not an ordinary citizen; he is a teenage gang member who was arrested while fleeing from the police with a loaded handgun; who has habitually violated his curfew ***." *Supra* ¶ 60.

Although we do not know for certain who he was sneaking out in the middle of the night to meet, the time of early morning does provide some clue.

¶ 101 Breaking bad habits appears to be difficult for this juvenile, even after he was arrested and facing charges. A failure to break these bad habits means that we will just encounter him again, only next time as an adult offender. I cannot find that the trial court committed plain error by applying the *verbatim* words of an uncontested statute and by providing a condition about which the juvenile defendant, his trial counsel, and his probation officer had no questions and no objections to it at the time the condition was included in his sentence.

¶ 102 The trial court gave the juvenile a simple directive: "[n]o contact with gangs, guns, drugs, including social media." This short mantra has words that can be easily grasped and recalled by even a still developing teenager. If the condition stated anything more specific, such as precise symbols or signs, the condition would become outdated before the ink was dry. *R.H.*, 2017 IL App (1st) 171332, ¶¶ 31-33.[5] This is even more true in this case, where the juvenile denies being a member of the gang that the police reported him to be a member of and claims now to be a member of a different gang. It is the juvenile's probation officer who is tasked with the job of keeping up with the ever-changing, minute-to-minute, world of gangs, members, signs, and symbols; the juvenile court's condition gives the probation officer the tools and flexibility to attempt to keep the juvenile out of trouble. *R.H.*, 2017 IL App (1st) 171332, ¶ 33 (any "prohibition would become stale the moment the members of that gang decided to change their shirts, move their activities, or splintered to form new, separate gangs"). The goal is to help this minor finish school, live with his parents, and stay away from gangs, guns, and drugs—just as the juvenile court wrote.

¶ 103 Minors have some, but not all, of the same constitutional protections afforded to adults, due to the particular vulnerability of children and their inability to make mature, nuanced decisions. *R.H.*, 2017 IL App (1st) 171332, ¶¶ 20, 27. Our Act provides: "This Act shall be administered in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court." 705 ILCS 405/1-2(2) (West 2016); see also *R.H.*, 2017 IL App (1st) 171332, ¶ 15 (discussing the "*parens patriae*" concerns expressed in both the Act and Illinois case law). The majority cites a *per curiam* opinion from 1971, in which a probation officer in California unfairly violated a minor. *Supra* ¶ 34[6] (citing *Arciniega v. Freeman*, 404 U.S. 4 (1971)); see *Edwards v. Carpenter*, 529 U.S. 446, 452 n.3 (2000) (questioning "the precedential value of a *per curiam* opinion"). If the majority has to reach back almost 50 years ago to find an example, then I do not find a need to raise an alarm about the misuse of the violation authority by probation officers and juvenile courts. For the most part, the probation officers and juvenile courts do a wonderful job with the difficult tasks that they face in helping juvenile offenders to change their lives and become useful citizens.

---

[5]The majority acknowledges that, although the exact parameters of a gang may be elusive to a reviewing court, the juvenile "had no difficulty recognizing and admitting that he is in one." *Supra* ¶ 48.

[6]The majority writes: "Maybe had respondent done so here, his probation officer would have put him at ease on this question. But maybe not. We cannot assume so, as the [1971] example in *Arciniega* *** makes clear." *Supra* ¶ 37.

¶ 104                                    III. Social Media

¶ 105          With respect to the trial court's ban on gangs, guns, and drugs appearing on the juvenile's social media accounts, our supreme court's opinion in *J.W.*, 204 Ill. 2d 50 (2003), governs our analysis. In *J.W.*, the court found that a blanket ban on a minor's entry into his hometown both failed to follow the Act and was unconstitutionally overbroad. *J.W.*, 204 Ill. 2d at 81-82.[7] By contrast, in the case at bar, the juvenile court did not impose a blanket ban on the juvenile's "travels" in social media. In the case at bar, the ban applies only to the juvenile's own social media accounts and applies only to guns, gangs, and drugs. When the trial court asked the juvenile defendant if he knew how to prevent other people from tagging him and, thus, possibly connecting him to these topics without his permission, he indicated that he knew what the court meant and knew how to prevent it from happening. The juvenile court asked him twice if he understood and if he had any questions, and he did not have a single question.

¶ 106          The majority acknowledges that there is a split in authority in this district of the appellate court and addresses the split by picking apart the cases and agreeing with one case on one point and the other case on another point. *Supra* ¶ 66. In *Omar F.*, 2017 IL App (1st) 171073, the Third Division of this court vacated a juvenile defendant's gang-related probation conditions, that were ordered by the same trial judge as in the case at bar. *Omar F.*, 2017 IL App (1st) 171073, ¶ 70. However, the Second Division of this court explicitly stated in a subsequent opinion: "We disagree with *Omar F.*" *R.H.*, 2017 IL App (1st) 171332, ¶ 4. Thus, we come to this issue with divergent precedent from our own district.

¶ 107          While both *Omar F.* and *R.H.* used broad sweeping language to justify their findings—a task usually best left to the legislature—a careful reading of these two opinions show that both courts were actually doing what courts do best, which is to apply the law to the specific facts in front of them. The two opinions, with their apparently divergent findings, can best be understood when read in light of their different facts: an admitted gang member, who was apparently unrepentant about his gang membership in *R.H.* (*R.H.*, 2017 IL App (1st) 171332, ¶¶ 7, 18-19), versus the minor in *Omar F.*, who denied any gang involvement and who had a brother, who had formerly been on the same path but now had turned his life around to serve as a potential role model for the *Omar F.* minor (*Omar F.*, 2017 IL App (1st) 171073, ¶¶ 62-63).

¶ 108          In the case at bar, the juvenile appears more similar to the juvenile in *R.H.*, and thus I reach the same finding that the *R.H.* court did and affirm the probation condition directing removal of all references to gangs, guns, and drugs from the juvenile's social media accounts. Like the juvenile in *R.H.*, the juvenile in the case at bar is also an admitted gang member convicted of a serious gun offense, namely, the possession of a loaded gun, and he has not argued on appeal for the need for an exception, due to particular role models or family members—or any other reason.

---

          [7]*J.W.*, 204 Ill. 2d at 81-82 ("the trial court, by failing to strictly conform the condition of probation to the requirements of the statute, imposed an overly broad and unconstitutional condition of probation").

¶ 109                                    IV. Conclusion

¶ 110    Thus, I concur with the majority's finding affirming the trial court's social media condition, but only for the reasons I have expressed. However, I must respectfully dissent from the majority's finding that the "no contact with gangs" condition is second-prong plain error. I cannot find that the integrity of our justice system is in danger, when the juvenile could have returned to the juvenile court at any time and instead decided to raise the issue, for the first time, in a reviewing court. *People v.* Sebby, 2017 IL 119445, ¶ 48 (when a defendant claims second-prong plain error, he must show that the error was so serious that it "challenged the integrity of the judicial process" (internal quotation marks omitted)). That's not what the second-prong of plain error is all about. The majority here seeks to change precedent and throw out the rules we have used for decades. I cannot be part of that.

¶ 111    This is not a typical case of forfeiture where, if the reviewing court does not review the claim, the matter is foreclosed and the claim is lost forever. The exact opposite is true in the juvenile courts, with respect to custody, probation, and conditions. The Act requires the juvenile court to be regularly updated, thus placing the juvenile court in a far better position than an appellate court to evaluate the record and make any adjustments that are needed. We should not want to encourage juvenile defendants to appeal first, before exhausting their remedies in the juvenile court. *E.g. In re Justin L.V.*, 377 Ill. App. 3d 1073, 1082-85 (2007) (a juvenile defendant may appeal from a trial court's order denying his motion to modify his sentencing order).

¶ 112    In addition, the majority's opinion is certainly advisory and contrary to what we should want to accomplish and is not in the best interests of the minor. *People v. Hampton*, 225 Ill. 2d 238, 245 (2007) (Addressing an issue "prematurely" creates an advisory opinion. "Advisory opinions are to be avoided."); see also 705 ILCS 405/1-2(1) (West 2016) (purpose and policy of the Act). For all these reasons, I must respectfully dissent from the portion of the majority's opinion reversing the court below. I would affirm and commend the juvenile court for what the trial court is trying to accomplish.